UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Civil Case 1:23-cv-20943-KMM MOORE/LOUIS

DON'T TREAD ON US, LLC, a Florida
limited liability company,

        Plaintiff,

v.

TWITTER, INC. a Delaware corporation,

        Defendant.

## REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiff Don't Tread on Us, LLC ("DTOU") opposes the motion to dismiss and doubles down on its implausible claim that Twitter breached its contract with DTOU's assignors by refusing to reinstate accounts on Twitter's social media platform. (Dkt. 11 ("Opposition").) However, the authorities DTOU relies upon in its Opposition are distinguishable and inapplicable to the facts at hand, and therefore do not cure the flaws in DTOU's claim. DTOU's claim should therefore be dismissed.

**I.   The Court Has Jurisdiction to Consider the Merits of DTOU's Claim if it Does Not Transfer this Action to the Northern District of California.[1]**

As an initial matter, DTOU argues that this Court lacks subject matter jurisdiction and is precluded from deciding Twitter's Motion to Dismiss on the merits. (Dkt. 11 at 2.) This argument is a red herring, and the Court should decline DTOU's invitation to deny Twitter's motion to dismiss as moot. It is undoubtable that judicial economy and applicable law provide for the transfer

---

[1] The Court should transfer this action. *See* Dkt. 5 (Motion to Transfer) and Dkt. 14 (Reply in Support of Motion to Transfer). But this reply is being filed in the meantime to meet the current deadlines in the case.

1

of this action. Dkt. 14 (Reply in Support of Motion to Transfer); *see also generally* Dkt. 1 ¶¶ 11-13 ("the amount in controversy exceeds the jurisdictional threshold"); Dkt. 5 at *6 ("the forum selection clause that governs the scope of [DTOU's] claims dictate that any dispute must be brought in San Francisco County, California"); Dkt. 6 at *1 ("Twitter is not waiving its transfer argument or the forum selection clause by timely moving to dismiss this action in order to preserve the arguments in this action for dismissal"). Indeed, this court has even previously transferred an action concerning the very same mandatory forum selection clause at issue here. *See Trump v. Twitter, Inc.*, 21-22441-CIV, 2021 WL 8202673, at *2-3 (S.D Fla. Oct. 26, 2021).

## II.     Twitter did not Modify the User Agreement.

DTOU also attempts to avoid dismissal by arguing that its breach of contract claim is solely "based on the parties' conduct, not the terms of service." (Dkt. 11 at *7). This is fatal to DTOU's claim. In each of the cases DTOU cites, the conduct which allegedly modified the contracts at issue consisted of specific and direct assurances to the plaintiff, which simply does not exist here.

For example, in *Berenson v. Twitter, Inc.*, Twitter announced a labeling policy in May 2020 to moderate misinformation concerning COVID-19 and Twitter's vice president of global communications "contacted plaintiff to open a direct line of communication with the company" about plaintiff's tweets. 21-09818 WHA, 2022 WL 1289049, at *1 (N.D. Cal. Apr. 29, 2022). With that direct line of communication, "plaintiff reached out and *received assurances* from Vice President Borman about how his tweets would be impacted by the policy." *Id*. at *2 (emphasis added). Subsequently, Twitter allegedly "established a specific, detailed five-strike policy regarding COVID-19 misinformation and its vice president gave specific and *direct* assurances to plaintiff regarding his posts pursuant to that policy." *Id*. For example, when Twitter announced the five-strike policy "Plaintiff again reached out to Vice President Borman, who replied, 'I will say

that your name has never come up in the discussions around these policies,' and that '[i]f it does I will try to ensure you're given a heads up before an action is taken, but I am not always made aware of them before they're executed.'" *Id*. After plaintiff subsequently received five strikes under the policy, the Twitter account was permanently suspended. *Id*.

On Twitter's motion to dismiss, the court declined to dismiss plaintiff's breach of contract and promissory estoppel claim because plaintiff "plausibly aver[red] that Twitter's conduct [] modified its contract with plaintiff and then breached that contract by failing to abide by its own five-strike policy *and its specific commitments set forth through its vice president*." *Id*. at 2-3 (emphasis added) (finding that, collectively, Twitter's "established [] policy that set out standards for account suspension" and "specific assurances to plaintiff" qualified as a clear and unambiguous promise). Further, the court specifically distinguished other opinions where the pleading did not allege that Twitter made a "specific representation directly to" the plaintiff "that they would not remove content . . . or deny access . . ." *Id*. at 3 (holding that plaintiff's breach of contract and promissory estoppel claims "survive for now," while dismissing plaintiff's other claims as futile). This type of direct communication and specific commitment between Plaintiff and Twitter does not exist here.

Next, DTOU cites to *Daugherty Co. v. Kimberly-Clark Corp*., 92 Cal. App. 3d 151 (Cal. App. 3d Dist. 1971) with a parenthetical stating that the court "revers[ed] dismissal of breach-of-contract claim based on party conduct." (Dkt. 11 at *7.) In *Daugherty*, there was a dispute of material fact as to whether there was an implied *abandonment* of the contract by the parties because there had been a "tremendous number of changes" with the contract and "[t]here was evidence that the job was completely redesigned after the contract was entered into." *Id*. at 155-56. The court reversed summary judgment in favor of defendants finding that abandonment was a factual issue

3

and it was not for the court to make the factual determination as to whether the parties' contract had been abandoned. *Id*. at 156-158. DTOU's complaint in this action does not allege abandonment, and the sheer number of changes at issue in *Daugherty* simply do not exist here. (Dkt. 1-1.)

DTOU also cites to *DDR Oceanside LLC v. Regal Cinemas, Inc.*, 04-CV-1176 IEG (BLM), 2005 WL 8173077, at *3 (S.D. Cal. Sept. 8, 2005) for the proposition that an agreement to modify a contract will be implied if the parties conduct is inconsistent with the contract. (Dkt. 11 at *7.) However, *DDR Oceanside* concerned a lease agreement and the court stated that under California law, "a contract's term can limit the ability of the parties to orally modify its terms" and "where a written agreement requires written modifications, oral amendments are precluded." *DDR Oceanside* LLC, 2005 WL 8173077, at *5. Here, the User Agreement states that Twitter may modify its terms of service by making the most current version available online. (Dkt. 1-1 at *8.) Thus, any modifications had to be reflected in writing in the online version of Twitter's User Agreement.

California law does not support DTOU's position that a single tweet—not specifically directed to anyone—could modify any contractual obligation. *See Gen. Electric Capital Corp. v. MSI Modular Sys.*, CV1409873RGKJEMX, 2015 WL 11438597, at *2 (C.D. Cal. Aug. 17, 2015) (stating that the Supreme Court has held that modification will be implied "where the subsequent conduct of the parties is inconsistent with and clearly contrary to provisions of the written agreement."); *Garcia v. World Sav., FSB*, 107 Cal. Rptr. 3d 683, 690 (Cal. App. 2d Dist. 2010) ("As a general rule, a gratuitous oral promise to postpone a foreclosure sale or to allow a borrower to delay monthly mortgage payments is unenforceable"). Significantly, Twitter took no actual action that was inconsistent with the User Agreement and DTOU's Complaint does not plead

otherwise. (Dkt. 1-1.). Furthermore, unlike *Berenson*, there was no conduct or representations specifically directed to DTOU's assignors. *See Murphy v. Twitter, Inc.*, 274 Cal. Rptr. 3d 360, 375 (Cal. App. 1st Dist. 2021) (rejecting the argument that Twitter was liable for any promises or representations made to plaintiff where plaintiff could not "identify any specific representation of fact or promise by Twitter to Murphy . . . beyond general statements in its monitoring policy").

Therefore, because DTOU concedes that its claim is not based on a breach of anything in the User Agreement itself,[2] the Court should dismiss DTOU's breach of contract claim because there was no modification of the User Agreement, and therefore no breach.

### III. Assignment is Prohibited Under the User Agreement.

DTOU argues that an agreement prohibiting an assignment of rights will not bar assignment of a claim for breach of the agreement without specific language to that effect. However, the cases DTOU cites do not support DTOU's position in this matter. In *Creditors Adjustment Bureau, Inc. v. IBT Media Inc.*, 19-CV-02305-LB, 2019 WL 3082845, at *2 (N.D. Cal. July 15, 2019), the court stated that "[p]rovisions prohibiting assignment of a contract, or any rights or interests in a contract, are generally valid and enforceable in California," but that "[a] provision in a contract or a rule of law against assignment does not preclude the assignment of money due or to become due under the contract or of money damages for the breach of the contract." *Id*. a *2; see also SK Networks Co. Ltd. v. Bentley Forbes Holdings, LLC*, CV1208997MMMSHX, 2013 WL 12131715, at *19 (C.D. Cal. Nov. 7, 2013) (cited by DTOU, but stating that "[i]n California, a contractual provision prohibiting assignment does not preclude assignment of a *cause of action for money damages*.") (emphasis added).

---

[2] (Dkt. 11 at *2 ("the argument that Plaintiff's claim is barred by language in the terms of service on Twitter's website is inapposite. Plaintiff's breach-of-contract claim is pled on the basis of party conduct which modified the written contractual terms")).

Here, DTOU wants to have its cake and eat it too. On the one hand, DTOU contends that Mr. and Mrs. Beck's breach of contract claim was assignable to DTOU. By virtue of the cases it cites in support, DTOU's claim must be one seeking relief in the form of money damages in order to be viable under this theory. (Dkt. 11 at *9.) *See Creditors Adjustment Bureau, Inc.*, 2019 WL 3082845, at * 2. However, in its motion to remand, DTOU attempts to argue that it "has made no monetary demand of any kind." (Dkt. 10 at *6.) Instead, DTOU alleges its primary purpose is to seek the reinstatement of Twitter accounts used by Mr. and Mrs. Beck. (*Id*.) Assignment of any such claim is precluded under the terms of the User Agreement. *Creditors Adjustment Bureau, Inc.*, 2019 WL 3082845 at *2; *SK Networks Co. Ltd.*, 2013 WL 12131715 at *19. Indeed, DTOU concedes that the prohibition on assignment relates "strictly to the user's license to use the software provided with Twitter's services." (Dkt. 11 at *9.) Under California law and the User Agreement's prohibition on assignment, DTOU cannot allege a non-monetary claim relating to the reinstatement of the Twitter accounts, and DTOU's claim should therefore be dismissed.

## IV.   Section 230 Bars DTOU's Claim.

DTOU also claims that Section 230 of the Communications Decency Act ("CDA") does not bar its breach of contract claims. However, this general proposition and the cases DTOU cites are distinguishable.

For example, in *Berenson*, the court held that Twitter was not entitled to Section 230 immunity for a breach of contract and promissory estoppel claim brought by a plaintiff, who was permanently suspended from Twitter, where the claims did "not seek to hold Twitter liable as a publisher or speaker of third party content, but rather as the counter-party to a contract, as a promisor who has breached." *Berenson*, 2022 WL 1289049 at *2 (citations omitted). But as detailed *supra*, in *Berenson*, Twitter's vice president of global marketing had direct and specific

communications with plaintiff where he provided assurances of Twitter's policy, and the court found that this altered the parties' contract. *Id*. at *3. That does not exist here. Indeed, DTOU cannot hold Twitter liable as the counter-party to a contract because its breach of contract claim based on an alleged modification fails. *See supra* at 2-3. Instead, the underlying issue here is that Twitter suspended the accounts and has refused to reinstate them. (Dkt. 11 at *1.) That is squarely a publisher decision.

Additionally, contrary to DTOU's arguments, California law is clear that Section 230 does bar breach of contract claims seeking the reinstatement of social media accounts. *See e.g. Murphy*, 274 Cal. Rptr. 3d at 377 (holding that each of Murphy's claims relating to her permanent suspension, including her breach of contract claim, was barred by Section 230); *Brittain v. Twitter, Inc.*, 19-CV-00114-YGR, 2019 WL 2423375, at *3 (N.D. Cal. June 10, 2019) (granting Twitter's motion to dismiss all claims relating to the suspension of four accounts, including a breach of contract claim, because Section 230 renders it immune from liability); *Yuksel v. Twitter, Inc.*, 22-CV-05415-TSH, 2022 WL 16748612, at *5 (N.D. Cal. Nov. 7, 2022) (finding that Section 230 did not provide an exception for plaintiff's breach of contract claim and stating that "courts routinely hold that Section 230 immunizes platforms from contract claims, where, as here, they seek to impose liability for protected publishing activity").

For example, in *Murphy*, 274 Cal. Rptr. 3d at 363, 370, the court affirmed dismissal of plaintiff's breach of contract and estoppel claims relating to the permanent suspension of a Twitter account on account of Section 230. There, the plaintiff sued Twitter because it permanently suspended her account. *Id*. The court found that "[b]ecause each of Murphy's causes of action seek to hold Twitter liable for its editorial decisions to block content she and others created from appearing on its platform, we conclude Murphy's suit is barred by the broad immunity conferred

by [Section 230]." *Id*. ("Twitter's refusal to allow certain content on its platform, however, is typical publisher conduct protected by section 230."). Indeed, "in assessing whether a claim treats a provider as a publisher or speaker of user-generated content, however, courts focus not on the name of the cause of action, but whether the plaintiff's claim requires the court to treat the defendant as the publisher or speaker of information created by another." *Id*. at 370. Therefore, "[c]ourts have routinely rejected a wide variety of civil claims like Murphy's that seek to hold interactive computer services liable for removing or *blocking content or suspending or deleting accounts* . . . on the grounds they are barred by the CDA." *Id*.

This Court should do the same here because the claims in *Murphy* are almost identical to the ones at issue here. *Id*. (distinguishing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009), *as amended* (Sept. 28, 2009)*, where plaintiff sought to hold Yahoo liable for its alleged promise to remove content). Specifically, like *Murphy*, the essence of DTOU's claim is that Mr. and Mrs. Beck's accounts were and remain permanently suspended. (Dkt. 1-1 at * 7 ("Mr. and Mrs. Beck's accounts have remained permanently suspended continuously until the present."). *Murphy*, 274 Cal. Rptr. 3d at 367 (seeking injunctive relief requiring the restoration of banned accounts). In addition, like *Murphy*, DTOU also complains that a tweet modified Mr. and Mrs. Beck's contract with Twitter. *Id.* (plaintiff also brought a promissory estoppel claim alleging that Twitter "violated several clear and unambiguous promises in the user agreement, on its website, and in public statements, including the promise not to monitor or censor content . . ."). *Murphy's* claims were barred by Section 230, and DTOU's claims here are also barred by Section 230. *Id*, at 377.

Furthermore, *Barnes*, the only other case cited by DTOU, "never suggested, however, that *all* contract or promissory estoppel claims survive CDA immunity." *Murphy*, 274 Cal. Rptr. 3d at

372 (citing *Barnes*, 570 F.3d at 1103). Instead, unlike *Barnes,* where the plaintiff sought damages for breach of a specific personal promise, here, like *Murphy*, "the substance of [DTOU's] complaint accuses Twitter of unfairly applying its general rules regarding what content it will publish" and seeks to have "Twitter restore [the] account." *Id*. at 373-75 ("Murphy does not identify any specific representation of fact or promise by Twitter to Murphy that it would not remove her tweets or suspend her account beyond general statements in its monitoring policy, the type of allegation the *Barnes* count noted would be insufficient to state a claim."). Therefore, DTOU's argument that Section 230 immunity does not bar its claim in this action is simply not supported by the law DTOU cites. *Berenson*, 2022 WL 1289049 at *2; *Barnes*, 570 F.3d at 1103. Instead, it is clear that Section 230 immunity *does* contemplate immunity for publishing decisions relating to a decision not to restore an account. *Murphy*, 274 Cal. Rptr. 3d at 372.

## CONCLUSION

     For the reasons stated above and in Twitter's Motion to Dismiss, the Court should enter an order dismissing DTOU's claims.

Respectfully submitted,

     /s/ Joshua C. Webb
Joshua C. Webb (FBN: 051679)
josh.webb@hwhlaw.com
val@hwhlaw.com
HILL, WARD & HENDERSON, P.A.
101 E Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
(813) 221-2900 (Facsimile)
*Attorneys for Defendant*